OPINION OF THE COURT
ROTH, Circuit Judge:
Mentholated tobacco products apparently pose greater health risks than non-mentholated ones. Plaintiffs, a group of African-Americans, brought a civil rights action, contending that, with this knowledge, defendant tobacco companies have targeted the marketing of mentholated tobacco products at African-Americans.
Plaintiffs, who designate themselves the “Black Smokers,” are the Rev. Jesse Brown, the Uptown Coalition for Tobacco Control and Healing, Aaron Eleazer, Pansy Smith, Ellen Irving, and the National Association of African Americans for Positive Imagery, Inc. They brought this civil rights action on behalf of a class of all living Black Americans who have, since 1954, purchased or consumed mentholated tobacco products. They named as defendants the tobacco companies: Philip Morris, Inc., R.J. Reynolds Tobacco Company, RJR Nabisco Holdings Corporation, Brown & Williamson Tobacco Corporation, B.A.T. Industries, the American Tobacco Company, Lorillard Tobacco Company, Inc., Liggett & Myers Tobacco Company, Liggett Group Inc. and United States Tobacco Company; the non-profit organizations supported by the tobacco-industry: the Tobacco Institute, Inc., the Council for *794 Tobacco Research—U.S.A., Inc., and Smokeless Tobacco Council, Inc.; and the public relations firm Hill & Knowlton, Inc. Black Smokers contend that each of the defendants has unlawfully engaged in targeted marketing and sales of mentholated tobacco products to African-Americans on the basis of their race in violation of the civil rights statutes codified at 42 U.S.C. §§ 1981, 1982, 1988 and 1985(3). Black Smokers also assert a cause of action against defendants under Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and the Fifth Amendment to the United States Constitution, arguing that defendants should be considered federal actors by virtue of the federal regulatory scheme to which the tobacco industry is subject.
The District Court granted defendants’ motion to dismiss for failure to state a claim. We will affirm that decision. We agree with the District Court that Black Smokers’ allegations of racially targeted marketing of mentholated tobacco products cannot, in the absence of any disparity between the products sold to African-Americans and the products sold to others, constitute a deprivation of contract or property rights actionable under §§ 1981 or 1982. We also concur with the District Court that there is no allegation that defendants are state actors to support the § 1983 claim and that defendants cannot be regarded as federal actors as is required to maintain the claims under Bivens and the Fifth Amendment. Although we agree with the District Court that Black Smokers failed to state a claim under § 1985(3), we need not reach the further question whether §§ 1981 and 1982 claims can, as a matter of law, support a claim under § 1985(3). As the District Court noted, even assuming arguendo that Black Smokers could properly premise a § 1985(3) cause of action on a violation of §§ 1981 and 1982, they have failed to state a claim under §§ 1981 and 1982.
I. FACTS
In their Second Amended Complaint, Black Smokers allege that the defendants have unlawfully targeted African-Americans with billboard, magazine, and other types of advertising in order to promote the sale to and consumption by African-Americans of various mentholated tobacco products. It is not disputed that the tobacco industry has designed certain menthol cigarettes specifically to appeal to African-American consumers, including R.J. Reynolds’ “Uptown,” a high tar, high nicotine menthol cigarette.[1] Black Smokers contend, and defendants do not dispute, that medical research has demonstrated that mentholated tobacco products pose greater health risks than non-mentholated ones, including an increased incidence of cancers of the lung and pharynx. It is not disputed that, although African-Americans account for only 10.3% of the U.S. population, they account for a significantly greater share of menthol cigarette smokers. Black Smokers cite reports fixing the percentage of African-American menthol smokers at, variously, 31%, 61.5% and 66%. Apparently relying upon the 31% figure, defendants claim that a significant majority (69%) of menthol cigarette smokers are not African-Americans and that Black Smokers admit that fact. In addition to the allegation of racially targeted marketing, Black Smokers also charge defendants with “intentional racial discrimination” and a “conspiracy of deception and *795 misrepresentation against the African American public.”
Black Smokers also accuse defendants of “a massive conspiracy to mislead the Black American public regarding the safety of menthol tobacco products.” Black Smokers identify three courses of conduct underlying the purported conspiracy: “(1) acting in concert to represent falsely that their menthol tobacco products are safe for African Americans to use; (2) engaging in a concerted campaign to saturate the African American community with dangerous, defective and hazardous tobacco products, which Tobacco Industry knew caused harm, in violation of the civil and constitutional rights of African Americans; and (3) misrepresenting, suppressing, distorting, and confusing the truth about the health dangers of mentholated tobacco products.” Notwithstanding these allegations, Black Smokers apparently concede in their opening appellate brief that African-Americans demonstrated their preference for menthol cigarettes before defendants initiated targeted advertising. In their reply brief and at oral argument, however, Black Smokers denied making such a concession and asserted that defendants created the African-American preference for menthol cigarettes. Black Smokers did not allege in their opening appellate brief that defendants interfere with the right of African Americans to purchase non-menthol cigarettes or that menthol cigarettes are not marketed and sold to persons other than African-Americans. However, in their reply brief and at oral argument, Black Smokers made the surprising statement that they “do not concede that Black Americans are free to purchase non-menthol cigarettes.”
Black Smokers do not contend that the menthol cigarettes marketed and sold to African-Americans are themselves different from those sold to whites or other persons. Additionally, Black Smokers do not aver that African-Americans receive information about menthol cigarettes that differs in any respect from the information provided to others. However, in their reply brief and at oral argument, Black Smokers made another surprising claim — • that while defendants suggest to African-Americans in advertising that menthol cigarettes are healthier than non-menthol cigarettes, are of high quality, enhance the smoker’s image, and are glamorous, prestigious and socially acceptable, “none of these sales messages or terms are targeted to white consumers.” Black Smokers agree, however, that defendants have employed targeted marketing (e.g., advertising using African-American models and athletes) to sell non-menthol cigarettes such as Camel, Lucky Strike, Kent and Eve. In addition, no party to the instant litigation alleges that defendants provide any consumers with warnings concerning the additional health risks posed by menthol cigarettes in comparison to non-mentholated tobacco products.
Black Smokers filed this action in the United States District Court for the Eastern District of Pennsylvania on October 19, 1998. A month later, Black Smokers filed a First Amended Class Action Complaint correcting the caption. By leave of the court, Black Smokers filed a Second Amended Complaint on December 9, 1998, in order to add claims purportedly arising under the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1985(3). On January 8, 1999, defendants filed a motion to dismiss the Second Amended Complaint. The District Court granted the motion to dismiss on September 23, 1999. Jesse Brown et al. v. Philip Morris, Inc., et al., No. Civ. A. 98-5518, 1999 WL 783712 (E.D.Pa. Sept.22, 1999). Black Smokers filed a timely Notice of Appeal on October 19, 1999.
*796 II. JURISDICTION AND STANDARD OF REVIEW
The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(1), (3) and (4), and 1332. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary-review over the District Court’s dismissal of a complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Gallas v. Supreme Court of Pennsylvania, 211 F.3d 760, 768 (3d Cir.2000). We must accept as true all of the factual allegations in the complaint as well as the reasonable inferences that can be drawn from them. Moore v. Tartler, 986 F.2d 682, 685 (3d Cir.1993). We may dismiss the complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).
III. DISCUSSION
A. REGULATING TOBACCO PRODUCTS
A brief summary of the federal regulation of the tobacco industry is a necessary prerequisite to a discussion of Black Smokers’ civil rights claims. Manufacturers of cigarettes are subject to the Federal Cigarette Labeling and Advertising Act of 1965 and its successor, the Public Health Cigarette Smoking Act of 1969, 15 U.S.C. § 1331, et seq. (together, the Labeling Act). The Labeling Act provides a comprehensive program of federal requirements addressing the labeling and advertising of cigarettes and preempts certain state law damages actions relating to smoking and health which challenge the adequacy of warnings on cigarette packages or the propriety of a manufacturer’s advertising or promotion of cigarettes. See Cipollone v. Liggett Group, Inc., 505 U.S. 504, 511, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). In Cipollone, the Supreme Court was called upon to determine the contours of the federal preemption of state law actions under the Labeling Act. The Court held that (i) the 1965 Act does not preempt state law damages actions in general; (ii) the 1969 Act does preempt claims based on a failure to warn and on the neutralization of federally mandated warnings to the extent that such claims rely on omissions or inclusions in a manufacturer’s advertising or promotions; and (iii) the 1969 Act does not preempt claims based on express warranty, intentional fraud and misrepresentation, or conspiracy. See Cipollone v. Liggett, 505 U.S. at 530-31, 112 S.Ct. 2608.
B. CIVIL RIGHTS CLAIMS: SECTIONS 1981 AND 1982
Section 1981, which prohibits racial discrimination in the making and enforcement of contracts and property transactions, provides:
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.
42 U.S.C. § 1981(a). Section 1981 is derived from the Civil Rights Act of 1866 and from the reenactment of Section 1 of the 1866 Act in 1870. Mahone v. Waddle, 564 F.2d 1018, 1030 (3d Cir.1977), citing Runyon v. McCrary, 427 U.S. 160, 168-70 & n. 8, 96 S.Ct. 2586, 49 L.Ed.2d 415; Civil Rights Act of 1866, ch. 31, section I, 14 Stat. 27, reenacted, Civil Rights Act of 1870, ch. 114, §§ 16, 18, 16 Stat. 144, *797 codified at 42 U.S.C. §§ 1981, 1982. The legislative history of the 1866 Act makes clear Congress’s intent to enact “sweeping legislation implementing the thirteenth amendment to abolish all the remaining badges and vestiges of the slavery system.” Mahone v. Waddle, 564 F.2d at 1030. As a result, the current statute rests not only on the Fourteenth Amendment but also on the Thirteenth Amendment to the Constitution. Runyon v. McCrary, 427 U.S. at 190, 96 S.Ct. 2586 (Stevens, J., concurring).
Section 1982, which prohibits racial discrimination in transactions relating to real and personal property, provides:
All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.
42 U.S.C. § 1982. Like § 1981, § 1982 is a Reconstruction statute enacted to effectuate the aims of the Thirteenth and Fourteenth Amendments to the Constitution. Because of the historic interrelationship between the two statutes, courts have consistently construed them together. See Saunders v. General Services Corp., 659 F.Supp. 1042, 1063 (E.D.Va.1987), citing Tillman v. Wheaton-Haven Recreation Association, 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973); Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976).
Although not identical, the requisite elements of claims under §§ 1981 and 1982 are quite similar. In neither ease need a plaintiff allege state action on the part of the defendant. See Stirgus v. Benoit, 720 F.Supp. 119 (N.D.Ill.1989) (§ 1982). In order to state a claim under § 1981, a plaintiff “must allege facts in support of the following elements: (1) [that plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute!,] which includes the right to make and enforce contracts.... ” Yelverton v. Lehman, No. Civ. A. 94-6114, 1996 WL 296551, at *7 (E.D.Pa. June 3, 1996), aff'd. mem., 175 F.3d 1012 (3d Cir.1999). In order to bring an action under § 1982, a plaintiff “must allege with specificity facts sufficient to show or raise a plausible inference of (1) the defendant’s racial animus; (2) intentional discrimination; and (3) that the defendant deprived plaintiff of his rights because of race.” Garg v. Albany Indus. Dev. Agency, 899 F.Supp. 961, 968 (N.D.N.Y.1995), aff'd, 104 F.3d 351 (Table), 1996 WL 547184 (2d Cir. Sept.26, 1996). See also Shaare Tefila Congregation v. Cobb, 481 U.S. 615, 616-17, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987).
Accepting as true the facts alleged in the complaint, we conclude that Black Smokers have not alleged a claim cognizable under either § 1981 or § 1982. Black Smokers do not make the sort of claim that is most readily actionable under the statute: that they have been deprived by defendants of the right to contract for, purchase, own or use either menthol or non-menthol cigarettes. Black Smokers do not aver that defendants have engaged in a discriminatory refusal to deal with African-Americans with respect to either menthol or non-menthol cigarettes. Nor do Black Smokers claim that defendants have dealt with customers on differing terms on the basis of race; Black Smokers concede that defendants sell menthol cigarettes to African-Americans at the same price and on the same terms as such products are offered to whites. Significantly, Black Smokers do not allege that the mentholated tobacco products sold to African-Americans differ from those sold to whites. *798 Furthermore, at no place in their submissions do Black Smokers argue any disparities with respect to the marketing or sales of non-menthol tobacco products on the basis of race. Consequently, it is difficult to understand Black Smokers’ allegations to constitute a deprivation of contract or property rights actionable under §§ 1981 or 1982. Indeed, Black Smokers’ complaint appears instead to present quite the opposite situation. Defendants are alleged to encourage the consumption by African-Americans of certain of their products: mentholated cigarettes, snuff, and chewing tobacco.
The question at the heart of Black Smokers’ §§ 1981 and 1982 claims, then, is whether such encouragement is unlawful under the civil rights statutes. At the outset, we note that neither party has alerted us to the existence of any authority standing for the proposition that an encouragement to deal is actionable under such statutes. Some authority does exist in support of the notion that targeting consumers for sales of defective products on the basis of race is actionable under §§ 1981 and 1982. For example, in Roper v. Edwards, 815 F.2d 1474 (11th Cir.1987), a case cited by Black Smokers, the Court of Appeals for the Eleventh Circuit suggests that a cause of action under § 1981 exists where a burial vault manufacturer made targeted sales of defective burial vaults to Black consumers. Although the case was brought by white plaintiffs who were inadvertently sold a defective vault, and although the Court of Appeals ultimately rejected plaintiffs’ claims on other grounds, Black Smokers correctly argue that the Eleventh Circuit did not reject the cause of action. Nevertheless, Roper is readily distinguishable from the case at bar because unlike Roper, which involved deceptive sales to African-Americans of products that differed from those sold to whites, this case concerns identical products; defendants sell the same menthol cigarettes to everyone.
One might argue that if racially directed marketing of menthol cigarettes resulted in a situation in which virtually all mentholated tobacco products were consumed by African-Americans and substantially all non-mentholated tobacco products by others, that case might come within the sweep of Roper. However, Black Smokers have not alleged such a situation.
In order to salvage their § 1981 claims, Black Smokers resort to several alternative theories of recovery. First, they suggest that defendants’ advertisements for menthol cigarettes constitute express warranties containing misrepresentations and false statements. This argument seems to constitute a claim of breach of express warranty, intentional fraud or misrepresentation. Although it is true that the Labeling Act does not preempt such an action, Cipollone v. Liggett, 505 U.S. at 526-529, 530-31, 112 S.Ct. 2608, Black Smokers fail to make sufficiently detailed allegations with respect to any of these potential causes of action. Black Smokers imply in their submissions, and asserted at oral argument, that defendants fail to disclose the increased health risks of menthol cigarettes and that the African-American community suffers damages as a result of its higher consumption of mentholated tobacco products. Although that claim may be factually true, it is not actionable. The Supreme Court has held that the 1969 Act preempts claims based on a failure to warn and on the neutralization of federally mandated warnings to the extent that such claims rely on omissions or inclusions in advertising or promotions. Cipollone v. Liggett, 505 U.S. 504, 530-531, 112 S.Ct. 2608, 120 L.Ed.2d 407.
*799 Second, Black Smokers attempt to raise a claim of segregated market exploitation by arguing that defendants’ practices fall within the ambit of segregated housing cases such as Clark v. Universal Builders, Inc., 501 F.2d 324 (7th Cir.1974). This claim also fails on both factual and legal grounds. In the segregated housing cases, unlike the instant case, the defendants sold houses to Black purchasers on substantially different and more onerous terms than to others, effectively creating two separate, racially-segregated markets. See, e.g., Clark v. Universal Builders, 501 F.2d at 328. Black Smokers, however, point to no such disparities in the sale of mentholated tobacco products, apart from the generalized allegation that African-Americans are more likely than others to buy mentholated tobacco products as a result of targeted advertising.
Moreover, even if Black Smokers’ segregated market exploitation claims were cognizable on the facts alleged, we must reject them on procedural grounds. It does not appear that Black Smokers advanced such claims in the District Court; arguments asserted for the first time on appeal are deemed to be waived and consequently are not susceptible of review in this Court absent exceptional circumstances {e.g., the public interest requires that the issues be heard or manifest injustice would result from the failure to consider such issues). See, e.g., United States v. Anthony Dell'Acquilla Enter. & Subsidiaries, 150 F.3d 329, 335 (3d Cir.1998) (citations omitted); United Parcel Serv. Inc. v. International Brotherhood of Teamsters, 55 F.3d 138, 140 n. 5 (3d Cir.1995). No such exceptional circumstances are apparent here.
Third, Black Smokers assert that defendants’ targeted marketing practices violate the “full and equal benefit” clause of § 1981, which provides that “[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory ... to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens....” 42 U.S.C. § 1981(a). Again, we must reject Black Smokers’ “full and equal benefit” claims because they do not appear to have been raised in the District Court and no exceptional circumstances suggest review of such claims notwithstanding Black Smokers’ failure to argue them previously. United States v. Anthony Dell’Aquilla Enter. & Subsidiaries, 150 F.3d at 335 (citations omitted). Moreover, even if we were to consider them, such “full and equal benefit” claims would fail in light of a substantial line of authority holding that only state actors can be sued under the “full and equal benefit” clause of § 1981. Mahone v. Waddle, 564 F.2d 1018, 1029 (3d Cir.1977); Sheppard v. Dickstein, Shapiro, Morin & Oshinsky, 59 F.Supp.2d 27, 30 n. 1 (D.D.C.1999) (dictum); Lewis v. J.C. Penney Co., 948 F.Supp. 367, 371 (D.Del.1996) (citations omitted); Sterling v. Kazmierczak, 983 F.Supp. 1186, 1192 (N.D.Ill.1997). As we explain in Sections III C and D, infra, the defendants in the instant case cannot be regarded as federal or state actors.
Notwithstanding Black Smokers’ arguments to the contrary, their complaints essentially constitute discriminatory advertising claims. Black Smokers virtually admit as much when they characterize their claims as allegations of discriminatory targeting in sales of allegedly defective products. Although Black Smokers argue that their claims resemble racial profiling and racially-motivated prepayment cases, all such fact patterns are distinguishable from the instant case because they involve either a naked, racially-motivated restriction on dealing or a race-based variation of the *800 terras of the contract at issue. Consequently, Black Smokers’ claims remain fundamentally allegations of discriminatory advertising and are not therefore cognizable under §§ 1981 or 1982.
Even in the context of housing discrimination — arguably a paradigmatic example of the rights Congress sought to protect under the Civil Rights Acts — ample authority exists in support of the proposition that discriminatory advertising is not actionable under §§ 1981 and 1982. See Jones v. Alfred H. Mayer Co., 392 U.S. 409, 413, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (noting that S 1982 does not prohibit “advertising or other representations that indicate discriminatory preferences”); Spann v. Colonial Village, Inc., 899 F.2d 24, 35 (D.C.Cir.1990) (holding that §§ 1981 and 1982 do not prohibit real estate advertisements indicating discriminatory preferences); Saunders v. General Services Corp., 659 F.Supp. 1042 (E.D.Va.1987) (declining to apply §§ 1981 or 1982 to racially discriminatory advertising for rental housing); Ragin v. Steiner, Clateman and Assocs., 714 F.Supp. 709, 713 (S.D.N.Y.1989) (same in context of cooperative apartment complex).
C. SECTION 1983
42 U.S.C. § 1983 provides a cause of action against any “person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected” any person to the deprivation of any right protected by federal law or the United States Constitution. Unlike §§ 1981 and 1982, § 1983 is derived from the Civil Rights Act of 1871, which was enacted to enforce the Fourteenth Amendment. Mahone v. Waddle, 564 F.2d 1018, 1031 (3d Cir.1977). Moreover, the Act of 1871, unlike the Act of 1866, is addressed only to the state and to those acting under color of state authority. Id. (citations omitted). It is well established that liability under § 1983 will not attach for actions taken under color of federal law. Bethea v. Reid, 445 F.2d 1163, 1164 (3d Cir.1971). In light of the fact that Black Smokers have not alleged that defendants are state, rather than federal actors, the District Court properly granted defendants’ motion to dismiss as to Black' Smokers’ § 1983 claims.
D. THE BIVENS AND FIFTH AMENDMENT CLAIMS
The controlling question with respect to Black Smokers’ claims under Bivens, supra, and the federal Constitution is whether defendant tobacco companies should be regarded as federal actors. In Bivens, the Supreme Court found that a damages claim arose under the federal Constitution where a federal agent acting under color of federal authority violated the Fourth Amendment. Id. A Bivens action, which is the federal equivalent of the § 1983 cause of action against state actors, will lie where the defendant has violated the plaintiffs rights under color of federal law. Alexander v. Pennsylvania Dep’t of Banking, No. Civ. 93-5510, 1994 WL 144305, at *3 (E.D.Pa. April 21, 1994). Black Smokers also make “direct constitutional” claims under the Fourteenth and Fifth Amendments. As the District Court noted in its opinion, the Fourteenth Amendment only applies to actions of the states and not to the federal government; therefore, the District Court properly granted defendants’ motion to dismiss the Fourteenth Amendment claims. For Black Smokers’ Bivens and Fifth Amendment claims to succeed, Black Smokers must establish that defendants are federal actors. Because defendants’ conduct cannot properly be regarded as federal, these claims must fail.
*801 In order to determine whether the conduct of a private party should be attributed to the federal government, courts apply the “state action” analysis set forth by the Supreme Court in Lugar v. Edmondson Oil Co., 457 U.S. 922, 937-42, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). The Supreme Court succinctly summarized the two-part test of Lugar in its decision in Edmonson v. Leesvitte Concrete, 500 U.S. 614, 620, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). There, the Court stated that Lu-gar requires courts to ask “first whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in [federal] authority ... and second, whether the private party charged with the deprivation could be described in all fairness as a [federal] actor.” Leesville Concrete, 500 U.S. at 620, 111 S.Ct. 2077 (applying Lugar) (citations omitted). Citing American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999), Black Smokers argue that their claims satisfy the first prong of Lugar insofar as defendants had acted “with knowledge of and pursuant to” the statute in question: the Labeling Act. This argument is unavailing because it fails to allege a deprivation of a right protected by the Constitution.
Moreover, the averment that defendants should be subject to the mandates of the Constitution because their activities have been allegedly approved by the federal government through defendants’ compliance with the Labeling Act is unconvincing. .The mere fact that a tobacco company has complied with the requirements of a federal law cannot suffice to transform it into a federal actor any more than the compliance of a myriad of private enterprises with federal law and administrative regulations could of itself work such a transformation.[2] Additionally, because the alleged wrongdoing (the targeted advertising of mentholated tobacco products to African-Americans) is not required by the Labeling Act, it is difficult to view such targeted advertising as federal action by defendants which can serve as the basis for a Bivens action.
The second requirement of the Lugar analysis — that the private party could in all fairness be regarded as a federal actor — may be met under one of three interrelated theories of government action: (i) the “public function” test, (ii) the “close nexus” test and (iii) the “symbiotic relationship” test. In addition, Black Smokers discern in case law a fourth, more synthetic “totality of the circumstances” test, the existence of which is doubtful, as we explain infra. In order to determine which test should be applied to a given set of facts, courts must investigate carefully the circumstances of each case. See Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Community Med. Center v. Emergency Med. Services, 712 F.2d 878, 880 (3d. Cir.1983) (citations omitted). Regardless of what test is ultimately applied, the object of the inquiry is to determine whether a private entity has exercised powers traditionally reserved exclusively to the government, Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), or whether “the defendant exercised power possessed by virtue of [federal] law and made possible only because the wrongdoer is clothed in the authority of [federal] law.” Groman v. Township of Manalapan, 47 F.3d 628, 639 n. 17 (3d Cir.1995) (citations omitted).
The gravamen of the “public function” test is whether the government *802 is effectively using the private entity in question to avoid a constitutional obligation or to engage in activities reserved to the government. See Goussis v. Kimball, 813 F.Supp. 352, 357 (E.D.Pa.1993). We cannot agree with Black Smokers’ assertion that defendants’ actions satisfy the “public function” test. The “public function” test is the most rigorous of the inquiries. In Blum v. Yaretsky, 457 U.S. at 1004-05, 102 S.Ct. 2777, the Supreme Court stressed that the traditionally public function must be the “exclusive prerogative of the [government],” id. (citation omitted). Courts generally emphasize this “exclusivity” requirement and thus seldom find that high standard to have been satisfied. Mark v. Borough of Hatboro, 51 F.3d 1137, 1142 (3d Cir.1995). Even in cases involving arguably semi-public functions, such as providing utility services, see Jackson v. Metropolitan Edison Co., supra, or furnishing remedial education to high school students, see Rendell-Baker v. Kohn, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the Supreme Court has declined to characterize such activities as government functions for purposes of the public function analysis.
In the case at bar, the action complained of is the lawful sale and marketing of a legal, albeit federally regulated, consumer product: a private rather than public, and a fortiori not “exclusively” public, function. Even if the activities at issue extended, as Black Smokers suggest, beyond the mere marketing and sale of mentholated tobacco products to the testing and labeling of such products, Black Smokers’ argument would fail because it would not meet the exclusivity requirement under the public function test. Given that many products, including mentholated tobacco, are tested, marketed and labeled by their manufacturers, often in accordance with applicable regulatory requirements, such activities cannot be characterized as the exclusive prerogative of the government. As the District Court noted, it is simply inaccurate to suggest that the testing, labeling and marketing of cigarettes is the exclusive province of the federal government. Finally, Black Smokers’ averment that defendants’ compliance with various federal labeling requirements transforms defendants into government actors is without support in applicable case law. Such propositions have been flatly rejected by the Supreme Court on several occasions; see American Mfrs. Mut. Ins. v. Sullivan, 526 U.S. 40, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999); Blum v. Yaretsky, 457 U.S. at 1004, 102 S.Ct. 2777; Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (holding that the fact that a business is subject to government regulation does not by itself convert the business’s action into that of the government).
Black Smokers’ allegations that defendants’ actions satisfy the “close nexus” test under the government action analysis are also unavailing. As with the public function analysis, Black Smokers apparently discern the purported nexus between the private action complained of and the federal government in the operation of the Labeling Act. They assert that the Labeling Act encourages tobacco manufacturers to conceal the dangers of mentholated cigarettes, mandates inadequate warnings on such products and preempts most tort actions against defendants. However, because the Labeling Act does not compel, influence or encourage the actions upon which this suit is based — the targeted marketing of menthol cigarettes to African-Americans — but rather only requires the disclosure of certain risks on tobacco product packaging, defendants’ conduct in compliance with the Labeling Act does not create the “close nexus” necessary for a finding of state action. See Rendell-Baker *803 v. Kohn, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. at 52, 119 S.Ct. 977; Goussis v. Kimball, 813 F.Supp. at 357. Additionally, Black Smokers’ “close nexus” argument is defective to the extent that it does not allege the violation of a federal right, a prerequisite under that analysis. See Goussis v. Kimball, 813 F.Supp. at 357.
Black Smokers’ attempt to classify this case under the “symbiotic relationship” category of state action cases is similarly tenuous. In the seminal, albeit somewhat idiosyncratic, case of Burton v. Wilmington Parking Auth., supra, the Supreme Court held that a coffee shop, which leased property located in a government owned parking garage, was integrated with the parking facility as an organic part of the government operation and was party to a mutually beneficial relationship with the government. Out of these facts arose the “symbiotic relationship test,” which asks whether the government has “insinuated itself into a position of interdependence” with the defendant. Burton v. Wilmington Parking Auth., 365 U.S. at 725, 81 S.Ct. 856.
Black Smokers’ allegations concerning defendants’ relationship with the federal government prove both too little and too much; and in any case, they scarcely suffice to make out a “symbiotic relationship” within the meaning of Burton. Black Smokers aver that (i) the government benefits from its relationship with defendants by virtue of collecting “enormous tax revenues” from the tobacco industry and (ii) the interests of the government and defendants are “explicitly intertwined” under the terms of the Labeling Act, id. While these averments are undoubtedly true, they are inadequate to demonstrate government action. Virtually all enterprises are subject to tax collection and, to varying degrees, to regimes of administrative regulation; were these attributes sufficient to satisfy the test of Burton, substantially all businesses in the country would effectively become federal actors. See Hadges v. Yonkers Racing Corp., 918 F.2d 1079, 1082 (2d Cir.1990). Moreover, although Burton retains much of its precedential value, it should be noted that the Supreme Court has recently cast some degree of doubt upon that decision. In American Mfrs. Mut. Ins. Co. v. Sullivan, supra, which reversed our finding that certain private insurance companies were to be regarded as state actors under Burton, the Supreme Court noted that “Burton was one of our early cases dealing with ‘state action’ under the Fourteenth Amendment, and later cases have refined the vague ‘joint participation’ test embodied in that case.” Id., 526 U.S. at 57, 119 S.Ct. 977 (citations omitted).[3]
Finally, Black Smokers contend that an expansive, fact-oriented “totality of the circumstances” approach to the question of government action exists wholly apart from the three inquiries discussed supra *804 and that such an approach is grounded in Third Circuit cases such as Sullivan v. Barnett, 139 F.3d 158 (3d Cir.1998), rev’d 526 U.S. 40,119 S.Ct. 977, 143 L.Ed.2d 130 (1999), and Mark v. Borough of Hatboro, 51 F.3d 1137 (3d Cir.1995). Although our cases place “the factual context in which the case arises,” Sullivan v. Barnett, 139 F.3d at 170, at the heart of the government action analysis, such emphasis constitutes no more than proper adherence to the methodology set forth in the government action cases discussed supra and consequently cannot be said to represent a novel development in or distinct branch of government action doctrine.
Purporting to use this asserted “totality of the circumstances” test as the basis of their remaining government action analysis, Black Smokers compare the instant case to Edmonson v. Leesville Concrete, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). Leaving aside the question whether the federal courts have ever explicitly recognized Black Smokers’ “totality of the circumstances” approach, the facts of the instant case are readily distinguishable from those of Edmonson. In Edmonson, the Supreme Court held that lawyers’ use of peremptory challenges was pursuant to a course of government action and consequently that any racially discriminatory use of such challenges violates jurors’ equal protection rights. Edmonson v. Leesville Concrete, 500 U.S. at 622-23, 111 S.Ct. 2077. The sine qua non of the Court’s decision in Edmonson was the presence of government involvement so pervasive in the context of the challenged actions as to render such actions virtually inseparable from the participation of the government. The Edmonson Court therefore emphasized that peremptory challenges “simply could not exist” without the government’s “significant participation.” Id. at 622, 111 S.Ct. 2077. The Court went on to characterize the jury as “a quintessential government body, having no attributes of a private actor,” id. at 624, 111 S.Ct. 2077, and to note that peremptory challenges are performed in the context of an inarguably “traditional government function”: trial by jury. Id. By contrast, in the instant case, the federal government does not in any manner design, mandate or approve the alleged racially targeted advertising of which Black Smokers complain, notwithstanding the fact that such advertising is subject to certain requirements and restrictions set forth in the Labeling Act. Black Smokers’ insistence at oral argument that the preemption of certain categories of tort actions by the Labeling Act in some way constitutes the exercise of a traditional government function or significant governmental participation within the meaning of Edmonson is also without support in applicable precedent; indeed, such preemption provisions are commonplace in federal product safety and information disclosure legislation. See, e.g., Federal Hazardous Substances Act, 15 U.S.C. § 1261 et seq., note (b)(1)(A); Moss v. Parks Corp., 985 F.2d 736, 739-41 (4th Cir.1993) (construing preemption provision of Federal Hazardous Substances Act). Moreover, the marketing and advertising practices of defendants, including their research and safety testing activities, are functions typical of various private enterprises and, even in light of the federal regulation to which such activities are subject under the Labeling Act and other legislation, are difficult to regard as “traditional government function[s]” within the meaning of Edmon-son.
E. SECTION 1985(3) CLAIM
Black Smokers’ 42 U.S.C. § 1985(3) claims are deficient in several respects and consequently may be dis *805 posed of relatively quickly. Section 1985(3) provides, in pertinent part:
If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... [and] in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for recovery of the damages, occasioned by such injury or deprivation, against any one or more of the conspirators.
42 U.S.C. § 1985(3). In general, the conspiracy provision of § 1985(3) provides a cause of action under rather limited circumstances against both private and state actors. In order successfully to bring an action under § 1985(3) for private conspiracy, a plaintiff must show, inter alia, “(a) that a racial or other class-based invidious discriminatory animus lay behind the co-conspirators’ actions, (b) that the cocon-spirators intended to deprive the victim of a right guaranteed by the Constitution against private impairment, and (c) that that right was consciously targeted and not just incidentally affected.” Spencer v. Casavilla, 44 F.3d 74, 77 (2d Cir.1994) (citation omitted); see also Tilton v. Richardson, 6 F.3d 683, 686 (10th Cir.1993) (holding that the same elements are required for § 1985(3) claims against private actors). In order to prevent the use of § 1985(3) as a general federal tort law, courts have been careful to limit causes of action thereunder to conspiracies that deprive persons of constitutionally protected rights, privileges and immunities “that are protected against private, as well as official encroachment.” Libertad v. Welch, 53 F.3d 428, 446-50 (1st Cir.1995).
It is well established that § 1985(3) does not itself create any substantive rights; rather, it serves only as a vehicle for vindicating federal rights and privileges which have been defined elsewhere. See Great Am. Fed. Sav. & Loan Ass’n v. Novotny, 442 U.S. 366, 376, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). Moreover, in the context of actions brought against private conspirators, the Supreme Court has thus far recognized only two rights protected under § 1985(3): the right to be free from involuntary servitude and the right to interstate travel. See Bray v. Alexandria Women’s Health Clinic, 506 U.S. 263, 278, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993); Caswell v. The Morning Call, Inc., No. Civ. A. 95-7081, 1996 WL 560355, at *6 (E.D.Pa. Sept.30, 1996); Welch v. Board of Dirs. of Wildwood Golf Club, 877 F.Supp. 955, 959 (W.D.Pa.1995).
The instant case is distinguishable from the cases cited above because Black Smokers assert the deprivation of a different type of rights: those of property and contract. Additionally, the District Court correctly observed that because such rights — which entail freedom from discrimination by a private actor — are statutorily enacted, rather than of purely constitutional provenance, they cannot be vindicated under § 1985(3).
Black Smokers attempt to salvage their § 1985(3) claims by arguing that defendants’ alleged violations of §§ 1981 and 1982 may support a claim under § 1985(3). In fight of the overwhelming preponderance of authority on the question, this argument, too, must fail. Contrary to Black Smokers’ claims, Bray does not sup *806 port the proposition that §§ 1981 or 1982 claims can form the basis of a § 1985(8) claim or the notion that the contract and property rights protected by §§ 1981 and 1982 fall within the category of “involuntary servitude” violations that may support a § 1985(3) claim. Isolated authority from the District Court for the District of Columbia does exist in support of the theory that a § 1985(3) claim may be based on a § 1981 claim. See Johnson v. Greater Southeast Community Hospital Corp., 903 F.Supp. 140, 153-154 (D.D.C.1995), citing Alder v. Columbia Historical Society, 690 F.Supp. 9 (D.D.C.1988); Thompson v. Int’l Assoc, of Machinists, 580 F.Supp. 662 (D.D.C.1984). The great weight of prece-dential authority, however, supports the traditional limitation of § 1985(3) to questions of interstate travel and involuntary servitude and does not suggest that §§ 1981 or 1982 claims in general may form the basis of a § 1985(3) action. See, e.g., Sanders v. Prentice-Hall Corp., 178 F.3d 1296 (Table), 1999 WL 115517, at *2 (6th Cir. Feb.8, 1999); Libertad v. Welch, 53 F.3d 428, 447 n. 15 (1st Cir.1995); Tilton v. Richardson, 6 F.3d 683, 686 (10th Cir.1993). We need not, however, resolve the question whether violations of §§ 1981 and 1982 can support a § 1985(3) claim because Black Smokers have failed to state a claim under either § 1981 or § 1982.[4] The District Court therefore correctly dismissed Black Smokers’ claims under § 1985(3).
IV. CONCLUSION
For the foregoing reasons, we will affirm the decision of the District Court in all respects. The District Court correctly held that Black Smokers’ claims of racially targeted advertising and marketing of mentholated tobacco products were inadequate to state a cause of action under 42 U.S.C. §§ 1981 and 1982. Because Black Smokers do not demonstrate that defendants should be regarded as state actors, the District Court properly dismissed their claims under 42 U.S.C. § 1983 as well. Finally, we will affirm the District Court’s conclusion that Black Smokers fail to allege adequately that defendants are federal actors for purposes of claims asserted either pursuant to Bivens or directly under the federal Constitution and that they fail to state a cause of action under § 1985(3).

. The Uptown brand was withdrawn from the market by R.J. Reynolds in 1990 as a result of negative national publicity.

. See our discussion of the "public function” test in this Section, infra.

. We recently applied the doctrine of Burton, as, refined by the Supreme Court in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), in Crissman v. Dover Downs Entertainment Inc., 239 F.3d 357 (3d Cir.2001). The instant case is distinguishable from Crissman because in the latter case, which involved state-licensed harness racing and related gambling activities, state involvement extended far beyond regulation and revenue collection. In Crissman, the harness racing operator functioned as the state's agent with respect to video lottery operations and was obligated to enforce a state statute relating to harness racing. See Crissman, 239 F.3d at 360-62 [Section III]. Such an agency relationship coupled with law enforcement authority confers upon the operator attributes of government sovereignty wholly absent in the federal government’s regulation of tobacco manufacturers.

. See Section III B, supra.