**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-2753

_____

LARRY G. DOCKERY, on behalf of
himself and all others similarly situated,
                                                    Appellant

v.

STEPHEN E. HERETICK; 321 HENDERSON RECEIVABLES LLC;
J.G. WENTWORTH ORIGINATIONS LLC; SENECA ONE FINANCE, INC.;
STRUCTURED SETTLEMENT PURCHASER JOHN DOE INC. 1-100

NEW YORK LIFE INSURANCE COMPANY; METLIFE INSURANCE COMPANY,
                                                    Nominal Defendants

_____

On Appeal from the United States District
Court for the Eastern District of Pennsylvania
(D.C. Civil No. 2:17-cv-04114)
District Judge: Honorable Chad F. Kenney

_____

Submitted Under Third Circuit L.A.R. 34.1(a):
September 22, 2022

Before: CHAGARES, *Chief Judge*, [1]MCKEE, and PORTER,
*Circuit Judges*.

(Filed: October 26, 2022)

_____

[1] Judge McKee assumed senior status on October 21, 2022.

———————————

OPINION[*]

———————————

PORTER, *Circuit Judge*.

After a workplace accident, Larry Dockery became the beneficiary of a structured settlement. Dockery received a lump-sum payment, as well as a structured annuity to be paid out over the next forty-five years. He chose to sell some of those annuity payments to Appellees in exchange for cash. Now, Dockery claims that his attorneys suffered from a conflict of interest, and that Appellees therefore lied when they claimed that Dockery received independent professional advice. Dockery's motion to compel additional discovery was untimely, and his RICO claim and attempt to certify a class are meritless. We will affirm the District Court.

I

Beneficiaries of structured settlement annuities may wish to receive some or all of their funds before they are due to be disbursed. Some choose to sell all or part of their annuity for a lump sum. Appellees 321 Henderson Receivables, LLC, J.G. Wentworth Originations LLC, and Structured Settlement Purchaser John Doe Inc. 1-100, are companies that purchase payment streams from annuity recipients.

In 2002, Congress passed the Victims of Terrorism Tax Relief Act of 2001, which imposed a forty percent tax on purchasers of future annuity payments. 26 U.S.C. § 5891.

———————————

[*] This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding precedent.

Purchasers can avoid this tax by receiving judicial approval of the sale through a "qualified order" in the state court where the seller is domiciled. A "qualified order" must contain judicial findings that the transaction (1) does not violate applicable law or administrative authority and (2) is in the best interests of the payee, taking into account the welfare and support of the payee's dependents." *See* 26 U.S.C. § 5891(b)(2)(A). Like most states, Virginia adopted a statute governing the "qualified order" process. Most relevant here, Virginia requires that a court find "[t]he payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and has either received such advice or knowingly waived [it] in writing." Va. Code § 59.1-476(2). So Appellees required all purchasers nationwide to hire an attorney to review the transaction and sign a letter confirming they had provided advice. The purchase agreements in this case stated that the seller "must retain the services of an attorney and deliver an opinion of [that] attorney about the sale of assigned assets to us in a form acceptable to us." App. 75. These letters were referred to as "Estoppel Letters," and the attorneys who delivered them were called "Estoppel Lawyers." App. 7.

When Dockery sold part of his annuity to Appellees, he executed an affidavit stating that "[i]t is my belief, and my representation to the Court, that this transfer lies in my best interests, together with that of my family." App. 76. Dockery's lawyer in the state court proceedings, Michael Shull, delivered an Estoppel Letter detailing his involvement in the sale. Attorney Shull's letter stated that he "acted as independent legal counsel to the Seller . . . and has provided legal, accounting and tax advice." App. 76–77. The Estoppel Letters were filed with Dockery's purchase agreement in the Portsmouth,

3

Virginia Circuit Court, which approved the transaction after a hearing, as required by statute Virginia law. Va. Code § 59.1-477.

After that transaction, Dockery continued to sell off portions of his structured settlement to Wentworth. App. 202–31, 1209–31. In each application for the sale of his annuity payments, Dockery acknowledged that he had "received legal, tax and accounting advice from independent practitioners, or [had] waived to obtain such legal, tax and accounting advice." App. 1614. Dockery's various Estoppel Lawyers continued to file Estoppel Letters, stating among other things that "Dockery has assured me that he has read and fully understands this purchase agreement and any consequences thereafter, and that this is what he desires to do." App. 78.

For each of these transactions, Appellees made representations in the Portsmouth court that Dockery "has been advised in writing by the transferee to seek independent professional advice *and has received such advice* reflected in the letter of his legal counsel." App. 88 (emphasis added). Dockery now argues that the Appellees knowingly lied to the Portsmouth court because they knew that his attorneys were not "independent," and thus could not give "independent professional advice." Specifically, Dockery alleged that the Estoppel Lawyers were paid on a contingent basis, that the Estoppel Letters were crafted by the Appellees, and that the Appellees picked the Estoppel Lawyers by repeatedly referring clients to them. Dockery asserted claims for violations of or conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act, unjust enrichment, and breach of fiduciary duty. He sought to certify a class of similarly situated plaintiffs who had been allegedly defrauded by Appellees through its

4

use of conflicted Estoppel Lawyers. The District Court denied Dockery's motion to compel discovery and motion for class certification, and it granted summary judgment in favor of Appellees. Dockery timely appealed.

II[2]

A

We review the District Court's denial of a discovery motion for abuse of discretion. *See Petrucelli v. Bohringer & Ratzinger*, 46 F.3d 1298, 1310 (3d Cir. 1995). Here, the parties agreed that discovery would close on April 30, 2021. Nonetheless, Dockery filed a motion to compel additional discovery on June 18, 2021. Thus, the motion to compel was filed after the discovery deadline, and the District Court did not abuse its discretion in denying this untimely motion. *See Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 643 (6th Cir. 2018) ("In general, a district court does not abuse its discretion by denying an untimely motion to compel that violated unambiguous discovery deadlines. . . ."). We will affirm the District Court's denial of Dockery's motion to compel.

B

Next, we review the District Court's class certification order for abuse of discretion. *See In re Lamictil Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 190 (3d Cir. 2020). The District Court denied class certification on four independent grounds.

---

[2] The District Court had jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(a). We have jurisdiction under 28 U.S.C. § 1291.

5

Specifically, the District Court held that Dockery failed to carry his class certification burden as to ascertainability, predominance, superiority, and adequacy.

Federal Rule of Civil Procedure 23 governs class action certification. The party seeking certification bears the burden of showing that Rule 23's requirements are met. *In re Hydrogen Peroxide Antitrust Lit.*, 552 F.3d 305, 311 (3d Cir. 2008). Dockery's proposed class included sellers of structured settlement agreements who satisfied certain criteria. *See* App. 21. Because Dockery asked the District Court to certify a class under Rule 23(b)(3), he was required to establish by a preponderance of the evidence that (1) membership in the proposed class is ascertainable with an objective criterion; (2) the core Rule 23(a) requirements are met; and (3) class-wide issues predominate over individual issues and a class action is the superior method of adjudicating the case. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590–93 (3d Cir. 2012). The District Court correctly determined that Dockery met none of those requirements.

On appeal, Dockery contests the District Court's holdings as to ascertainability and adequacy. This Court reviews both conclusions for an abuse of discretion. *In re Lamictil Direct Purchaser Antitrust Litig.*, 957 F.3d at 190.

The District Court found that Dockery failed to prove the proposed class was ascertainable. It determined there was insufficient common evidence for one criterion of the proposed class—namely, that the lawyers for the proposed plaintiffs were paid on a contingent basis. Dockery asserts that the Court ignored his theory of liability based on conflicts of interests between potential class members and the Estoppel Lawyers. He misunderstands the District Court's analysis. His failure to identify common proof that all

6

potential class members had entered a contingency fee agreement with their respective counsel renders the class unascertainable, even if he could otherwise show a conflict of interest by common proof. But the District Court believed that it "could remove the 'on a contingency basis' provision" and the class would be ascertainable. App. 30. As a result, it did not end its inquiry and analyzed the remaining Rule 23(b)(3) requirements. The District Court did not abuse its discretion when it assumed that Dockery would agree to amend the class definition before analyzing the Rule 23 factors.

Nor did the District Court abuse its discretion when it determined that Dockery was an inadequate representative. District courts may consider whether named plaintiffs' claims may fail because of a statute-of-limitations defense when deciding if the named plaintiffs "can adequately represent absent class members whose claims do not suffer from timeliness problems." *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 295 (3d Cir. 2010); *see also China Agritech, Inc. v. Resh*, 138 S.Ct. 1800 (2018) ("A would-be class representative who commences suit after expiration of the limitation period, however, can hardly qualify as diligent in asserting claims and pursuing relief."). Here, the District Court found that Dockery faces a potential bar to his claim that is not common to all class members. Namely, he must overcome a statute-of-limitations defense while "some putative class members could potentially succeed in bringing a timely claim based on their lawyer/client interactions." App. 70. For this reason, the District Court concluded that Dockery risks the viability of other potential members' claims. That was not an abuse of discretion.

Even if Dockery were correct on ascertainability and adequacy, he has forfeited any argument as to predominance and superiority by failing to brief the issue before this Court. *See Gorum v. Sessoms*, 561 F.3d 179, 185 n.3 (3d Cir. 2009) (abandonment of issues forfeits them on appeal); *see also Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 147 (3d Cir. 2017) ("[W]e will not reach a forfeited issue in civil cases absent truly 'exceptional circumstances.'" (quoting *Brown v. Philip Morris Inc.*, 250 F.3d 789, 799 (3d Cir. 2001))). Because the District Court ruled against Dockery on every element of class certification, his forfeiture is fatal to his claim. *See, e.g., Applewhite v. Reichhold Chemicals., Inc.*, 67 F.3d 571, 573, 573 n.6 (5th Cir. 1995) (affirming denial of class certification when "plaintiffs' brief fail[ed] to address the requirements of Rule 23(b)(3)"). So we will affirm the District Court's denial of class certification.[3]

C

Finally, we turn to the District Court's summary judgment order. We "review grants of summary judgment de novo." *Fraternal Ord. of Police, Lodge 1 v. City of*

---

[3] Even if we were to consider the District Court's 23(b)(3) holdings, Dockery would have to demonstrate that predominance was satisfied by demonstrating that "*each element* of the alleged RICO violation involves common questions of law and fact [and is] capable of proof by evidence common to the class." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 489 (3d Cir. 2015). He would then have to demonstrate that a class action would be superior to individual actions in resolving the underlying claims. *See* Fed. R. Civ. P. 23(b). But the District Court identified numerous grounds for finding a lack of superiority when it determined that "individual inquiries are necessary at minimum to determine the predicate act of mail fraud, the enterprise element, and the timeliness of the class's claims for every class member." App. 62. We agree and hold that the District Court did not abuse its discretion.

*Camden*, 842 F.3d 231, 238 (3d Cir. 2016). A grant of summary judgment must be upheld when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For the following reasons, we will affirm the District Court's grant of summary judgment.

Dockery premises his evidence of mail fraud solely on alleged misrepresentations in the Portsmouth court. Specifically, Dockery claims that this statement to the Portsmouth court was false: "[1] That the transferor/payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and [2] has received such advice reflected in the letter of his legal counsel which is attached hereto." App. 88. The Virginia statute at issue expressly defines "independent professional advice" as "advice of an attorney, certified public accountant, actuary, or other licensed professional advisor." Va. Code § 59.1-475. There is no doubt that Dockery was "advised in writing to receive independent professional advice," as required by statute. He received this advice in his purchase agreements. *See, e.g.*, App. 1388 (signed purchase agreements stating "You acknowledge that We advised You to obtain independent professional tax advice . . . . You acknowledge that We advised You must obtain independent legal advice . . . ."). He also received this advice in Wentworth's disclosures. *See* App. 90 ("You *should* consult your own counsel, accountant, or financial advisor . . . ."). We agree with the District Court that it was not a misrepresentation to state that Dockery was advised in writing to receive independent professional advice.

Dockery also alleges that Appellees lied to the Portsmouth court when they represented that he had *in fact* received that independent professional advice. Dockery

9

contends that, although he "had received help filling out the paperwork for his transactions" from various lawyers, the "lawyers were not independent at all." Appellant Br. at 4, 40. He alleges that Appellees had created a system in which lawyers were, among other things, recommended by the Appellees, given form letters by the Appellees, and ultimately paid from the proceeds of the annuity sale.[4] Thus, he avers, these "Estoppel Lawyers" were given a financial motive to rubber stamp the form letters to receive repeat business and profit from the sale of annuity payments, even when the sales of such payments were not in the interest of the payees.

These allegations are troubling. For instance, one Estoppel Lawyer "believed that the terms of the transaction were exploitative but did not include that belief in his Estoppel Letter." App. 81. But as the District Court noted, Dockery *did* receive "independent professional advice" as defined by the relevant statute. Despite Dockery's otherwise plausible argument that the advice he received was not "independent," the Virginia legislature expressly defined the phrase to mean "the advice of an attorney, certified public accountant, actuary, or other licensed professional advisor." Va. Code § 59.1-475. "When a statute includes an explicit definition, we must follow that definition, even if it varies from a term's ordinary meaning." *Tanzin v. Tanvir*, 141 S. Ct. 486, 490 (2020) (internal quotation marks omitted).[5] So the relevant question is not

---

[4] While many of these facts were generally alleged for purposes of class certification, Dockery denied that *his* Estoppel Lawyers were referred by JG Wentworth. App. 1799–1800.

[5] Dockery's statutory interpretation argument turns on the surplusage canon. He says that the word "independent" must carry some meaning. But while semantic canons are valuable tools in interpreting the definition of words in their ordinary usage, "[s]tatutory

whether the Estoppel Lawyers were independent of Appellees but whether Dockery received "the advice of an attorney, certified public accountant, actuary, or other licensed professional advisor." He undoubtedly did. And while we remain deeply troubled by Dockery's allegations and the risk of exploitation inherent in Appellees' attorney referral system, it is ultimately the place of the legislature, not the judiciary, to update Va. Code § 59.1-475 to address those machinations. We will affirm the District Court's grant of summary judgment.

*　　*　　*

We will affirm the District Court's order denying Dockery's untimely motion to compel. Because the District Court did not abuse its discretion in finding that Dockery failed to prove ascertainability and adequacy, and because Dockery forfeited any arguments as to superiority and issue predominance, we will affirm the District Court's denial of class certification. Because the District Court did not err in construing Va. Code § 59.1-475, we will affirm the District Court's grant of summary judgment.

---

definitions control the meaning of statutory words." *Burgess v. United States*, 553 U.S. 124, 130 (2008) (quoting *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949)). Virginia Code § 59.1-475 is, no doubt, inartfully drafted. And statutorily defined terms, like legal terms of art, have "been known to rankle nonlawyers when they encounter it." A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 73. But that does not make the District Court's interpretation of the underlying statute erroneous.

11